## FREEMAN v. ASMUS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

No. 323. Argued April 20, 21, 1892. — Decided May 16, 1892.

The first claim of reissued letters patent No. 3204, granted to George Asmus, November 24, 1868, for an improvement in blast furnaces, on the surrender of original letters patent No. 70,447, granted to F. W. Lürmann, of Osnabruck, in Prussia, November 5, 1867, namely, " A blast furnace with a closed breast, where the slag is discharged through an opening or openings cooled by water, substantially as set forth," is invalid, because there was nothing in the original specification indicating that any such claim was intended to be made in the original patent, although the application for the reissue was made less than a year after the original patent was granted; and because, as respected that claim, the reissue was not for the same invention as the original patent, and was, therefore, within the express exception of the statute (Act of July 4, 1836, c. 357, § 13, 5 Stat. 122).

The cases in this court on the subject of reissues, reviewed.

The fact commented on, that the application for the reissue was not signed or sworn to by the inventor, but only by the assignee of the patent.

THE court stated the case as follows :

This is a suit in equity, brought in the Circuit Court of the United States for the Eastern District of Pennsylvania, by George Asmus against Margaret C. Freeman, founded on the alleged infringement of reissued letters patent No. 3204, granted to said Asmus, November 24, 1868, on the surrender of original letters patent No. 70,447, granted to F. W. Lürmann, of Osnabruck, in Prussia, November 5, 1867, for an improvement in blast furnaces.

On the 12th of July, 1867, Lürmann assigned to Asmus all the right, title and interest in and to the improvement for which Lürmann was about to apply for a patent, and the specification for which was signed by him on that day. The patent was granted to Lürmann, although the assignment was recorded in the Patent Office some time before the granting of the patent.

On the 3d of November, 1868, Asmus filed in the Patent Office a petition signed by himself, but not signed by Lürmann, praying for the reissue of the patent. In that petition, Asmus stated that he believed that the original patent was inoperative and invalid by reason of a defective specification, which defect had arisen from inadvertence and mistake; and he asked that a new patent might issue to him for the same invention, for the residue of the period of the original patent, under the amended specification therewith presented. The oath annexed thereto, made by Asmus, was sworn to October 24, 1868, and stated that Asmus verily believed that by reason of an insufficient or defective specification, the original patent was not "fully valid and available to him," and that the error had arisen from inadvertence, accident or mistake, and without any fraudulent or deceptive intention. Accompanying the petition and oath was a statement signed by the attorneys for Asmus, which said: "The errors and defects occurring in the original specification by inadvertence and mistake and sought to be corrected by this application for a reissue are as follows: The invention, as described in the original specification and represented in the drawings, clearly comprises a blast furnace with a closed breast, where the slag is discharged through an opening or openings cooled with water, but the claim in the original specification is confined to a slag-discharge piece or cinder block constructed and attached in a certain specific manner. It is obvious that the cinder block D can be connected to or cast solid with the plate C, without changing the nature of the invention, and in the new specification this defect has been corrected and a clause has been added to the claim with the view to cover the whole ground of the invention."

The answer of the defendant denies the novelty of the invention, the alleged infringement, and the validity of the reissue, and assigns as grounds of such invalidity that the application for the reissue was not assented to, signed or sworn to by Lürmann; that the reissue was for an invention different from that claimed in the original patent; and that the reissue contains much new matter interpolated by Asmus. Several other defences were also set up.

With a view to a comparison of the specification of the original with that of the reissue, the following paper contains both of the specifications, the parts in italics not being found in the original, and the parts in brackets not being found in the reissue:

"Be it known that [I] F. W. Lürmann, of Osnabruck, in the Kingdom of Prussia [have] invented a new and useful improvement in blast furnaces, and I, *George Asmus, of the city, county, and State of New York, assignee of the said F. W. Lurmann,* do hereby declare [that] the following [is] *to be* a full, clear, and exact description thereof, which will enable those skilled in the art to make and use the same, reference being had to the accompanying drawing, forming part of this specification, in which drawing Figure 1 is a vertical central section of a furnace [to which my improvement is applied] *built according to this invention.* Fig. 2 is a horizontal section through the tuyeres. Fig. 3 is a front elevation of the slag-discharge piece *or cinder block* detached. Fig. 4 is a vertical section *thereof* [of the latter, also detached]. *Similar letters indicate corresponding parts.*

"This invention relates to [furnaces for smelting iron ore, and has for its object to dispense with the 'tymp' or fore hearth and the 'wall stone' now in common use in iron blast furnaces, and to replace the tymp arrangement by such a construction as allows the slag to] *certain improvements in blast furnaces with a closed breast; and it consists, principally, in a blast furnace with a closed breast, where the slag is discharged through an opening cooled with water in such a manner that the tymp or fore hearth and the wall stone can be dispensed with, and that the slag can* be tapped directly from the hearth. *It consists, further, in a slag-discharge piece or 'cinder block' of peculiar construction, as will be hereinafter more fully explained, whereby the building of a furnace according to this invention and its correct operation are materially facilitated. In order to enable those skilled in the art to fully understand the object of this invention, I will first point out the disadvantages of blast furnaces with a fore hearth, such as are now in common use for melting iron ore.* In *such* [the tymp arrange-

ment] *furnaces* the slag is driven out [of the furnace] by *first being* [being first] forced below the tymp stone, which projects below the level of the tuyeres and intercepts the currents of air and prevents their escape with the slag which stands in the [tymp] *fore hearth* at the same level as on the hearth, the slag being discharged only when it rises in the [tymp] *fore hearth* high enough to overflow the top of the wall stone that forms the bottom of the discharging orifice. By this arrangement the tymp stone constitutes a trap which intercepts the currents of air and causes their pressure to be exerted directly on the surface of the slag on the hearth. This method of construction has several disadvantages, one of which is the difficulty of keeping the tymp stone and the surrounding parts in repair; another is, that the pressure of the currents of air or wind is limited [and counteracted] by the counter-pressure of the column of slag in the [tymp] *fore hearth ;* and another is that, one side of the furnace being occupied by the [tymp,] *fore hearth*, no tuyere can be applied on that side, and consequently the supply of wind is irregularly distributed. *By the improvement which constitutes the subject-matter of this present invention these disadvantages are overcome* [My invention avoids or overcomes these disadvantages] in a simple and effective manner.

"In [this example of my invention] *the drawings* the letter A designates the furnace, and B several tuyeres, which are arranged therein at a proper height. *The furnace is constructed with a closed breast,* [My furnace has no tymp] and the sides of the hearth, whether round or square, extend clear down to the bottom stone, the usual opening, (not shown in the drawing,) being made in the lower part of the hearth for the discharge of the iron. The openings for the tuyeres B are distributed at equal distances apart in the sides of the hearth. At a suitable height from the bottom stone [I leave] an opening *is left* in the hearth, in which [I place] *is placed* a cast-iron or brass slag-discharge piece *or cinder block*, D, which is cast or made with numerous channels or pipes running up and down or in other directions through it, as shown in Figs. 3 and 4. The *cinder block* [piece] D [is] *may be*

formed with a dovetail on its upper end, which is fitted into the bottom of a stationary metallic plate, C, connected with the furnace, *or it may be attached to said plate in any other desirable manner, or cast solid with the same, if desired.* [The] *This* plate [C] is also cast or made with channels or pipes running through it, and the channels or pipes of said plate and of the *cinder block* [piece] D may be so arranged as to connect or communicate with each other when the plate C and *cinder block* [piece] D are in their proper *position*, [positions] or they may be independent of each other. *In the drawing the plate C is shown above the cinder block, but it may also be placed below or in any other desirable position in relation to the same.* The object of the [said] channels or pipes is to permit the plate C and *cinder block* [piece] D to be cooled by forcing water through them while the furnace is in operation, proper connections being made for that purpose with a reservoir of cold water or with a force-pump. One or more holes are made in *the* [said piece] *cinder block* D, through which the slag is discharged, the shape of said holes being shown in Figs. 3 and 4, the middle portion being cylindrical, but each end being conical or flaring. The dimensions of the [slag-discharge piece] *cinder block* are a little less than the opening in which it is placed and the space left around it is filled with sand, which can be readily removed in case it is desired to remove the block D to repair it or if it is desired to have an opening in the hearth to work through, as when any irregularity in the smelting process has taken place. The flow of the cooling water through the [slag-discharge piece] *cinder block* D is regulated for the purpose of controlling the discharge of the slag through it. By allowing much cooling water to circulate through its water channels or pipes, the temperature of the *block* [piece] D is lowered sufficiently to allow a coating of slag to adhere and choke its discharge openings, which are of less diameter in the middle than at their ends. By reducing the flow of cooling water the *cinder block* [piece] is allowed to retain a higher temperature, and in consequence the slag is melted out of the discharge openings and they become clear and open and permit the slag to flow

without interruption. When the slag in the hearth is [lower than] *below* the level of the discharge openings the latter are simply closed by an iron *plug* [rod]. [My] *This* invention can be easily applied by those skilled in the art to which it belongs, to blast furnaces of the common construction, *by removing the fore hearth and closing the aperture left in the breast of the furnace under the tymp stone by inserting the plate C with the cinder block D.* [This invention is attended with several advantages over the common method of constructing or arranging furnaces, among which I mention the following:] *The principal advantages derived from this invention are as follows:* First, it permits a higher pressure of wind. Second, the hearth is preserved in better condition than where the common mode of construction is retained. Third, the labor of the operation of smelting is lessened. Fourth, it allows one more side of the hearth for a tuyere. Fifth, it avoids the stoppages of the wind supply now necessary as often as the iron is discharged. Sixth, a considerable increase is gained in the product of the furnace, while at the same time the cost of labor and repairs is lessened.

" *Having thus described this invention,* [What] *what* I claim as new, and desire to secure by letters patent, is —

" 1. *A blast furnace with a closed breast, where the slag is discharged through an opening or openings cooled by water, substantially as set forth.*

" [1.] 2. The slag-discharge piece *or cinder block* D, constructed and arranged substantially as described.

" [2.] 3. The [slag-discharge piece] *cinder block* D, in combination with the plate C, to which it is *fitted* [attached,] substantially as described.

" [3.] 4. The shape of the discharge opening or openings of the *cinder block* [piece] D, being made flaring at its ends, and of diminished diameter in the middle or central part, substantially as described.

" [4.] 5. *The combining* [Combining with] *of* the slag-discharge piece *or cinder block with* a series of water channels or pipes, substantially as and for the purpose above set forth.

" [5.] 6. Combining with the metallic plate C a series of water channels or pipes, substantially as and for the purpose set forth.

" [6.] 7. The method of controlling the discharge of slag from blast furnaces by regulating the temperature of the slag-discharge piece *or cinder block*, substantially as described.

" This specification signed by me this [twelfth day of July, 1867,] 24*th day of October*, 1868.

"[F. W. LÜRMANN.]    *George Asmus.*"

After a hearing on pleadings and proofs, the court entered a decree, on the 19th of July, 1886, adjudging that the re-issued patent was valid; that the defendant had infringed its first claim; and that the plaintiff was entitled to recover profits and damages, and referring it to a master to ascertain the same. The opinion of the Circuit Court was given May 14, 1886, and is reported in 27 Fed. Rep. 684. On the report of the master, a final decree was made by the court October 12, 1888, awarding to the plaintiff $1000 damages and the costs of suit. The defendant has appealed to this court.

*Mr. William D. Baldwin* for appellant. *Mr. Wayne MacVeagh* was with him on the brief.

*Mr. William Bakewell* and *Mr. Thomas B. Kerr* for appellee.

The validity of the patent in suit is contested on the grounds that the original patent was not surrendered for good and lawful cause; that the reissue, as granted, is not for the same invention " which was specified in the said original letters patent," but, on the contrary, was obtained on the application of an assignee, without the knowledge or consent of the inventor, for the purpose of expanding or enlarging the claims, so as to cover another and different invention from that described and claimed in the original letters patent, and that the reissue was unlawfully and unwarrantably expanded and enlarged to cover inventions other and different from and broader than those de-

scribed and claimed in said original letters patent, and that said reissued letters patent are therefore void.

In the cases on reissue, especially those decided by this court, it will be found that it is not the mere fact of reissue, or of a change in the specification or in the claims, which is the cause of the trouble. There is always something else which renders such changes improper, as, for example, that the patentee has slept on his rights and allowed an undue time to elapse after the grant of the original patent before applying for reissue, the reasonable time being usually two years in analogy to the right an inventor has to use his invention publicly for that length of time before completing his application; or that the purpose of the reissue is merely to expand the claims beyond the scope of the described invention; or that it was made in order to claim that for which the applicant was refused a patent by the patent office, withdrawing the claim in order to obtain his patent; or to introduce into the specification some new suggestion of invention and base a claim upon it, or to claim a patent for that which was not claimed in the original. In these cases reissues are held to be invalid.

None of these adverse circumstances exist in this case. We start with the following facts: (1) That the specification and drawings of the reissue are substantially the same as the original patent. This appellant's expert admits: (2) That the only claim in which a decree is asked in favor of the appellee (the first) is for an invention which is (*a*) clearly and fully described in the original specification: (*b*) distinctly stated in the original specification to be the invention of the applicant: (*c*) manifestly the same which the original patent states to be the gist of the invention: (3) That the application was made within one year after the date of the original patent: (4) That there is no evidence that the invention was used by the public between the dates of the original and the reissue so that no adverse rights have accrued.

An objection to the reissue is made in the answer that it was obtained on an application of an assignee and without the knowledge or consent of the inventor. A sufficient reply to this is that the reissue was granted under the act of 1836,

which does not require the consent or knowledge of the inventor, and that by the act of March 3, 1871, it is expressly provided that the requirement that in case of reissue by assignees the specification shall be sworn to by the inventor, if living, shall not be construed to apply to patents issued and assigned, (as was the patent in this suit,) prior to July 8, 1870. In such a case the reissue was proper. *Walker* v. *Terre Haute*, 44 Fed. Rep. 70, 73.

Nor may it be amiss to advert to the fact that this reissue was granted in 1868, under the provisions of the 13th section of the Patent Act of 1836, which expressly authorized the amendment of the claims of the original patent as well as of the description of the invention. Prior to the act of 1870 the word "specification" always meant the claim as distinguished from the description, as is clearly pointed out in Robinson on Patents, Vol. 2, Sec. 655 and note 2, and admirably elucidated by Mr. Justice Blatchford, in *Wilson* v. *Coon*, 18 Blatchford, 532–536. Now, the reissue section of the act of 1836 (§ 13) provides that on surrender of a patent the Commissioner shall "cause a new patent to be issued to the said inventor for the same invention . . . in accordance with the patentee's corrected description *and specification.*"

In the case of *Hurlbut* v. *Schillinger*, 130 U. S. 456, 468, the original patent was for concrete pavement laid in sections with strips of tar paper interposed between the sections. The only claim was "the arrangement of tar paper, or its equivalent, between adjoining blocks of concrete, substantially as and for the purpose described." This patent was dated July 19, 1870. In May, 1871, a reissue was granted with two claims, one like the claim of the original, except for the substitution of the words "set forth" in place of the word "described." Another claim was added as follows: "A concrete pavement laid in detached blocks or sections substantially in the manner shown and described."

In this case as in the patent in suit, the invention covered by the new claim of the reissue was not specifically claimed in the original, and the reissue application was made within one year. A clause had been inserted in the new specification to

the effect that "the tar paper may be omitted and the blocks formed without interposing anything between the joints," but this was stricken out by disclaimer. The reissue was sustained by this court, and Mr. Justice Blatchford, speaking for the court, says: "To limit the patent to the permanent interposition of a material equivalent to tar paper would limit the actual invention." See also *Eames* v. *Andrews*, 122 U. S. 40.

We submit that these examples of the application by this court of the doctrines of law relating to reissues fully warrant the reissue in the present case; for, if anything is clear in the case at bar, it is that the original specification not only fully describes the invention claimed in the first claim of the reissue, but distinctly states it to be the invention sought to be patented, the whole described construction, as well as the claims necessarily implying the use of a closed breast to the blast furnace with provision for discharging the slag through an opening cooled by water.

Mr. Justice Blatchford, after stating the case, delivered the opinion of the court.

As we are of opinion that the decree below must be reversed, because of the invalidity of the reissue, it is unnecessary to consider any other question.

The only claim of the reissue which, it is now contended, was infringed, is the first claim, which reads as follows: "1. A blast furnace with a closed breast, where the slag is discharged through an opening or openings cooled by water, substantially as set forth." Claims 2 to 7, inclusive, of the reissue are substantially in the same language as claims 1 to 6 of the original. Claim 1 in the reissue is entirely new, and it is not contended here that the defendant infringed any of the claims of the original patent, or any claim of the reissue other than claim 1.

It was held by the Circuit Court that, while claim 1 of the reissue was not embraced in the original, the matter claimed by that claim was so embraced; that the language of the original specification clearly described the closed-breast furnace; that a furnace built in accordance with the language of the

original would be necessarily closed-breasted; that the other element of claim 1 of the reissue, "where the slag is discharged through an opening or openings cooled by water," was no less clearly described in the original; that the drawings originally filed showed the same; that claim 1 of the reissue might, therefore, have been embraced in the patent as first issued, or introduced into the reissue without changing the specification; that the change made by the reissue simply expressed the same thing in different terms; that claim 1 of the reissue was, therefore, not an enlargement of the invention; that such additional claim, omitted through inadvertence, accident or mistake, might be secured by means of a reissue, if applied for within a reasonable time; that in this case the application was made a little after the expiration of one year; and that the question whether the omission occurred through inadvertence, accident or mistake, was a question for the Commissioner of Patents.

But we are of opinion that these views cannot prevail in the present case. It is apparent, from the description contained in the specification of the original patent, that Lürmann considered his invention to consist essentially of a removable slag-discharge piece, cast with numerous channels or pipes running through it, formed with a dovetail at its upper end fitted into the bottom of a stationary metallic plate connected with the furnace, and provided with channels or pipes so that water might flow through the slag-discharge piece and plate, conjointly or separately, that they might be cooled while the furnace was in operation. The slag-discharge piece was made removable, and provided with one or more holes, the middle portion of the holes being cylindrical, but each end being conical or flaring. By regulating the flow of water through the slag-discharge piece, its temperature could be lowered sufficiently to allow a coating of slag to choke the discharge-opening, which coating could be melted out by diminishing the flow of water and thus allowing the temperature to rise. The opening could be closed by an iron block when necessary.

The fundamental devices claimed by Lürmann as his improvements were (1) the metal plate C, provided with water

channels; (2) the removable slag-discharge piece provided with water channels; and (3) the method of regulating the discharge of the slag by raising and lowering the temperature of the slag-discharge piece.

The first claim of the original patent claimed a slag-discharge piece provided with a water circulation, connected with a water-cooled plate C, having small hour-glass-shaped discharge openings, and capable of being removed from the furnace when desired. The slag-discharge piece of the second claim was of the same character as that described in the first claim. The third claim was for the shape of the slag-discharge opening, flaring at its ends, and of diminished diameter in the middle. The fourth claim was for the combination of such slag-discharge piece and a series of water channels or pipes. The fifth claim was for the combination of the metallic plate C, with a series of water channels or pipes. The sixth claim was for regulating the discharge of the slag by varying the temperature of the water-cooled slag-discharge piece.

Asmus, in his testimony, states that his reason for obtaining a reissue was to make the meaning of the whole invention as clear as possible; that the reason why he did not apply sooner for the reissue was that, in arranging a number of furnaces, they differed more or less in construction, and he had to adapt his construction according to the circumstances; that this made it necessary to give the construction quite different shapes, retaining always the main points; that experience caused him, in order to prevent mistakes, to find a formula which expressed the spirit of the invention in the clearest way possible, and which flowed plainly from the technical description given in the original patent; and that the experience and the reasoning derived from it took up some time. When asked what kind of mistakes he referred to, he said; "That difference in shape might be taken for a different thing."

This testimony shows that, instead of desiring merely to remedy formal defects which appeared on the face of the papers, Asmus waited until experience and reasoning had shown him the broadest formula in which to express the claims of his patent so as to cover all possible modifications.

While the petition for the reissue states that Asmus believes that the original patent "is inoperative and invalid by reason of a defective specification," he does not make that allegation in his oath, but states in the latter merely that the patent "is not fully valid and available to him;" and in the statement accompanying the petition and oath, his attorneys say that the claim in the original specification is confined to a slag-discharge piece or cinder block constructed and attached in a certain specific manner, and that the new first claim is added "with the view to cover the whole ground of the invention." A comparison of the original specification with that of the reissue shows that the only substantial change made is to insert in the latter enlarged definitions and descriptions of the alleged invention, and the new and enlarged first claim.

In the assignment of July 12, 1867, from Lürmann to Asmus, which bears date the same day as the signature of Lürmann to the original specification, the latter says that his invention "is fully described in the specification pertaining to said application, which I have signed under oath." The inventor did not swear to the specification filed for the reissue; and, although his oath was not required to it, as the law stood at the time the reissue was applied for, yet the fact remains that the reissue was wholly the work of the assignee and not at all of the inventor; and it by no means followed that the inventor would ever have asserted that there was any error in the original specification or claims, arising from inadvertence, accident or mistake.

The new matter inserted in the specification of the reissue, and hereinbefore set forth in italics, in connection with the omission from the reissue of the parts in brackets contained in the original, constituted a broad definition on which to found claim 1 of the reissue — a claim to "a blast furnace with a closed breast, where the slag is discharged through an opening or openings cooled by water, substantially as set forth." In addition to the description in the original of the connection of the slag-discharge piece with the metallic plate C, it is also stated in the reissue that such slag-discharge piece may be attached to the plate C "in any other desirable manner, or

"cast solid with the same, if desired." This is new matter, as is also the addition, in the specification of the reissue, that, in the drawing, the plate C is shown above the slag-discharge piece or cinder block, but that it may also be placed below, or in any other desirable position in relation to the same. So, also, it is added in the specification of the reissue that the invention can be applied to blast furnaces of the common construction "by removing the fore hearth and closing the aperture left in the breast of the furnace under the tymp stone by inserting the plate C with the cinder block D."

But the material point is the extension of the invention claimed, by the addition of claim 1 of the reissue, the words in which, "substantially as set forth," refer to the new matter in the reissue, that the slag is discharged "through an opening cooled with water in such a manner that the tymp, or fore hearth, and the wall stone can be dispensed with." The intention manifestly was to construe the first claim so as to cover any kind of blast furnace with a closed breast, having a slag-discharge opening cooled in any manner or to any extent by water. There is nothing in the original specification which indicates that any such claim was intended to be made in the original patent. On the contrary, the whole purport of that specification shows that it was intended to claim only a slag-discharge piece or cinder block constructed and attached in a specific manner, as is set forth in the statement of the attorneys of Asmus, accompanying his application for the reissue.

This case was decided in the Circuit Court, May 14, 1886; and both before and since that there have been numerous decisions in this court which require that the present reissue be held invalid, although it was applied for within less than a year after the granting of the original patent. Those cases are, *Mahn* v. *Harwood*, 112 U. S. 354; *Coon* v. *Wilson*, 113 U. S. 268; *Ives* v. *Sargent*, 119 U. S. 652; *Parker & Whipple Co.* v. *Yale Clock Co.*, 123 U. S. 87; *Matthews* v. *Ironclad Mfg. Co.*, 124 U. S. 347; *Hoskin* v. *Fisher*, 125 U. S. 217; *Flower* v. *Detroit*, 127 U. S. 563; *Yale Lock Co.* v. *Berkshire Bank*, 135 U. S. 342; *Electric Gas Co.* v. *Boston Electric Co.*, 139 U. S. 481.

In *Mahn* v. *Harwood*, a reissue was held invalid, where it was clear that the only object of it was to enlarge the claims of the original patent. The description was not altered in the least. The claims in the original were clear and explicit, one of them being retained substantially in the reissue. Nothing was altered or changed, except to multiply the claims and make them greater, and that was done, not for the benefit of the original patentee, but for that of his assignee.

In *Coon* v. *Wilson*, the application for the reissue was made a little more than three months after the granting of the original patent; but it was said that a clear mistake, inadvertently committed, in the wording of the claim, was necessary, without reference to the length of time; that there was no mistake in the wording of the claim of the original; that the description warranted no other claim and did not warrant the claim of the reissue; that the description had to be changed in the reissue to warrant its new claim; and that the description in the reissue was not a more clear and satisfactory statement of what was described in the original, but was a description of a different thing, so ingeniously worded as to cover what was claimed in the reissue.

In *Ives* v. *Sargent*, the doctrine of *Coon* v. *Wilson* was approved and applied.

The whole subject was reviewed in *Parker & Whipple Co.* v. *Yale Clock Co.*, and the *dicta* in the case of *Seymour* v. *Osborne*, 11 Wall. 516, were considered; and it was held that what was suggested or indicated in the original specification was not to be considered as a part of the original invention intended to be covered by the original patent, unless it could be seen, from a comparison of the two patents, that the invention which the original was intended to cover embraced the things thus suggested or indicated in the original specification, and unless the original specification indicated that those things were embraced in the invention intended to have been secured by the original patent. The cases of *Mahn* v. *Harwood* and *Coon* v. *Wilson* were cited and approved.

The case of *Parker & Whipple Co.* v. *Yale Clock Co.* is cited and applied in *Matthews* v. *Ironclad Mfg. Co.*, in *Hoskin* v.

*Fisher*, in *Yale Lock Co.* v. *James*, 125 U. S. 447, 464, and in *Flower* v. *Detroit*.

In *Yale Lock Co.* v. *Berkshire Bank*, a reissue was held invalid, although it was applied for only thirteen days after the granting of the original, because there was not a clear mistake, inadvertently committed, in the wording of the claim; and the cases of *Coon* v. *Wilson*, *Ives* v. *Sargent* and *Parker & Whipple Co.* v. *Yale Clock Co.* were cited and applied.

In *Electric Gas Co.* v. *Boston Electric Co.*, a reissue was held invalid because there was no inadvertence, accident or mistake, such as would authorize a reissue with new claims, and the sole object of the reissue was unlawfully to expand the claims.

We are of opinion that the present reissue is invalid, so far as the first claim of it is concerned, because it is not for the same invention as the original patent, and is, therefore, within the express exception of the statute, (Act of July 4, 1836, c. 357, § 13, 5 Stat. 122). There is nothing inconsistent with the foregoing views, in our decision in *Topliff* v. *Topliff*, *ante*, 156.

*The decree of the Circuit Court is reversed, and the case remanded to that court, with a direction to dismiss the bill, with costs.*